UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEGAL SEA FOODS, LLC,<br><br>     *Plaintiff*,<br><br>v.<br><br>STRATHMORE INSURANCE COMPANY,<br><br>     *Defendant*. | Civil Action No.: 1:20-CV-10850 |

## FIRST AMENDED COMPLAINT

Plaintiff Legal Sea Foods, LLC ("Legal Sea Foods") files this First Amended Complaint for damages and declaratory judgment against Defendant Strathmore Insurance Company ("Strathmore"), alleging the following:

## <u>INTRODUCTION</u>

1.     This diversity action for breach of contract, violation of Chapter 93A of the Massachusetts General Laws, and declaratory judgment arises out of Legal Sea Foods' claim of insurance coverage under an "all risks" insurance policy sold by Strathmore to Legal Sea Foods and Strathmore's groundless and unlawful denial of the same.

2.     Critically, the policy was entered into and became effective on March 1, 2020, months after Strathmore had knowledge that the novel virus, SARS-CoV-2, the causative agent for COVID-19, could cause direct physical loss of or damage to property and months after Strathmore had knowledge that businesses in China, Italy, and elsewhere in the world were being shuttered because of the presence and spread of COVID-19.

3.      Despite its knowledge, Strathmore sold this insurance policy to Legal Sea Foods *without any virus or pandemic exclusion or limitation whatsoever* in exchange for a substantial premium, even though such exclusions are in use throughout the insurance industry.

4.      Yet, only weeks later, after COVID-19 caused Legal Sea Foods to close its doors as a consequence of myriad civil authority orders issued because of the physical loss of or damage to property caused by COVID-19 and the dangerous conditions associated with that damage, Strathmore turned its back on Legal Sea Foods, refused to honor its contractual promises under the insurance policy, and denied coverage for Legal Sea Foods' substantial financial losses.

## THE PARTIES

5.      Legal Sea Foods is a limited liability company organized under the laws of the State of Delaware, registered to do business in the Commonwealth of Massachusetts, with its principal place of business at One Seafood Way, Boston, Massachusetts.

6.      Strathmore is incorporated under the laws of New York with a principal place of business at 200 Madison Avenue, New York, New York.

7.      Strathmore is authorized to do business and issue insurance policies in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.      Venue is proper in this District under 28 U.S.C. § 1391, because Legal Sea Foods' principal place of business is in this District and a substantial portion of the events and omissions giving rise to the claims and losses occurred within the District.

**FACTUAL BACKGROUND**

10.     Legal Sea Foods owns and operates 34 restaurants in Massachusetts, the District of Columbia, New Jersey, Pennsylvania, Rhode Island, and Virginia.

11.     Legal Sea Foods was born in 1950 when George Berkowitz opened a fish market in the Inman Square neighborhood of Cambridge, Massachusetts. The Berkowitz family opened its first restaurant in 1968, right next to the fish market. Despite the low-key trappings, the food was second to none and word quickly spread.

12.     This early success led to further expansion, and now, six decades later with restaurants along the Eastern Seaboard, the family philosophy endures:  Legal Sea Foods is a fish company in the restaurant business.

13.     The freshness of Legal Sea Foods' seafood inventory is critical to its business operations and emblematic of its reputation and brand.

14.     In addition, its excellent customer service and friendly and welcoming atmosphere at its physical locations are critical to its business operations, reputation, and brand.

15.     To protect its family-built and operated business in the event of property loss and business interruption, Legal Sea Foods purchased a commercial property insurance policy from Strathmore. See Policy No. 8120T24753, attached as Exhibit A (the "Policy").

16.     The Policy insures against all risks of loss of or damage to property and ensuing business interruption and extra expense, unless specifically excluded or limited in the Policy.

17.     During the Policy's term, the novel coronavirus, SARS-CoV-2, commonly referred to as COVID-19, swept the globe.

18.     As of this filing, nearly 2 million Americans have suffered from confirmed cases of COVID-19, countless more have been infected without COVID-19 without confirmation, and

over 102,000 Americans have died from COVID-19, according to the Center for Systems Science and Engineering at Johns Hopkins University.[1]

19.     According to scientists, COVID-19 has several modes of transmission.

20.     In a "Situation Report" released by the World Health Organization ("WHO"), it is reported that the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[2]

21.     Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual. Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[3]

22.     The incubation period for COVID-19 – the time between exposure to the virus (becoming infected) and symptom onset – averages 5-6 days; however, it can be up to 14 days.[4]

23.     During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious. In other words, pre-symptomatic transmission can occur before the infected person shows any symptoms.[5]

---

[1] See *https://coronavirus.jhu.edu/us-map* (last viewed June 5, 2020). This is a 65% increase in confirmed deaths from COVID-19 since Legal Sea Foods filed its original Complaint in this matter just one month ago, on May 4, 2020. See Doc. 1.

[2] See *https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2* (last viewed June 5, 2020).

[3] See id. ("Data from clinical and other studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in upper respiratory tract (nose and throat) early in the course of the disease. That is, within the first 3 days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.") (last viewed June 5, 2020).

[4] See id. (last viewed June 5, 2020).

[5] See id. ("In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they

24.     Not only is COVID-19 spread by human-to-human transfer, but the WHO has confirmed that the virus can live on contaminated objects or surfaces.

25.     According to a study documented in the *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[6]

26.     The study suggests that individuals could become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

27.     All of these aforementioned materials (including stainless steel, plastic, glass and copper) are used in Legal Sea Foods' food preparation and service.

28.     Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[7]

29.     Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[8]

30.     Surfaces, once physically affected by COVID-19, are referred to as fomites.[9]

---

develop symptoms. Thus, it is possible that people infected with COVID-19 could transmit the virus before significant symptoms develop.") (last viewed June 5, 2020).

[6] See *https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces* (last viewed June 5, 2020); see also *https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations* (last viewed June 5, 2020).

[7] See *https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3* (last viewed June 5, 2020).

[8] See id. (last viewed June 5, 2020).

[9] See *https://aem.asm.org/content/73/6/1687* (last viewed June 5, 2020).

31.     Fomites consist of both porous and nonporous surfaces or objects that can become contaminated with a virus and serve as vehicles in transmission.[10]

32.     During and after illness, viruses are shed in large numbers in body secretions, including blood, feces, urine, saliva, and nasal fluid.[11]

33.     Fomites become contaminated with virus by direct physical contact with body secretions or fluids, contact with soiled hands, contact with aerosolized virus (large droplet spread) released while talking, sneezing, coughing, or vomiting, or contact with airborne virus that settles after disturbance of a contaminated fomite (e.g., shaking a contaminated tablecloth).[12]

34.     Once a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites.[13]

35.     On March 27, 2020, the Centers for Disease Control and Prevention ("CDC") released a report titled *"Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February - March 2020."*[14]

36.     The report details COVID-19 outbreaks on three different cruise ships, which caused more than 800 confirmed cases and 10 deaths.[15]

---

[10] Id.

[11] Id.

[12] Id.

[13] Id.

[14] See *https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w* (last viewed June 5, 2020).

[15] Id. ("During February 7–23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3. On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons aged ≥65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

37.     Of the individuals tested, a high proportion were found to be asymptomatic.[16]

38.     Significantly, COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess, but before disinfection procedures.[17]

39.     The CDC notes that more studies are required to understand COVID-19 transmission, but the uncertainty has serious implications for food service safety.[18]

40.     In an effort to combat the virus and slow the spread of COVID-19, state and local governments have imposed directives requiring residents to remain in their homes unless performing "essential" activities, like shopping for food, going to see a doctor, or getting fresh air ("Stay at Home Orders").

41.     The Stay at Home Orders typically require businesses deemed "non-essential" to be closed and in-person work is not permitted.

42.     However, even businesses classified as "essential" have been impacted by the pandemic.

43.     Stay at Home Orders remain in effect and have caused the suspension of both non-essential and essential businesses.

---

[16] Id.

[17] See id. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine. On the Grand Princess, crew members were likely infected on voyage A and then transmitted SARS-CoV-2 to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew...Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of SARS-CoV-2 aboard cruise ships is warranted.").

[18] See *https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html* (CDC guidance on restaurant and bar operations, last updated May 27, 2020) (last viewed on June 5, 2020).

44.     As a business with operations in each of these locations, Legal Sea Foods is subject to these various Stay at Home Orders.

45.     Stay at Home Orders and the transmission of COVID-19 have had a devastating effect on Legal Sea Foods' business.

46.     Legal Sea Foods is no longer permitted to operate its dining rooms and is restricted to carry out or delivery services.

47.     Carry out or delivery services are not feasible for Legal Sea Foods given its menu, brand, and business, all of which were known to Strathmore when it underwrote and agreed to insure Legal Sea Foods.

48.     Legal Sea Foods has suffered direct physical loss of or damage to its property caused by COVID-19.

49.     Likewise, property within one mile of Legal Sea Foods' insured locations has suffered direct physical loss of or damage to property, all caused by COVID-19.

**The Strathmore Policy**

50.     Strathmore issued the Policy number 8120T24753, effective March 1, 2020 to March 1, 2021, to Legal Sea Foods.

51.     The Policy provides business income and extra expense insurance coverage for its designated premises, subject to a blanket limit of $94,852,397. See Exhibit A, Commercial Property Declarations.

52.     Specifically, the Policy covers:

    a.     The direct physical loss of or damage to Legal Sea Foods' property;

b.     The actual loss of business income Legal Sea Foods sustains due to the necessary suspension of its operations, where the suspension is caused by direct physical loss of or damage to Legal Sea Foods property;

c.     Legal Sea Foods' extra expense to avoid or minimize the suspension of its business;

d.     The actual loss of business income Legal Sea Foods sustains and necessary extra expense caused by an action of civil authority that prohibits access to Legal Sea Foods' property; and

e.     The actual loss of business income Legal Sea Foods sustains due to the suspension of its operations, where the suspension is caused by direct physical loss or damage to property operated by others whom Legal Sea Foods depends upon to (i) deliver materials and services, (ii) accept Legal Sea Foods products and services, (iii) manufacture Legal Sea Foods products for delivery to customers; and (iv) attract customers to Legal Sea Foods' business.

53.     The Policy does not contain a virus exclusion, even though Strathmore could have included such an exclusion in the Policy.

54.     The Policy does not contain a pandemic exclusion, even though Strathmore could have included such an exclusion in the Policy.

55.     In 2006, the Insurance Services Office ("ISO"), an insurance industry organization that develops standardized insurance policy programs and forms for use by insurers, drafted a form exclusion for losses "due to disease-causing agents such as viruses and bacteria."

56.     In presenting the exclusion to state insurance regulators around the country, ISO explained:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

57.     Even though the Policy contains other ISO forms, Strathmore did not add ISO's virus exclusion endorsement.

58.     In other words, Strathmore had the opportunity to use standard insurance industry forms or language to specifically exclude virus losses like those resulting from COVID-19 from coverage, but it chose not to do so.

59.     Strathmore made this decision despite the existence and globally visible impact of COVID-19 at the time the Policy became effective.

**The Stay at Home Orders**

60.     In the United States, state and local governments have responded by issuing "social distancing" and Stay at Home Orders to limit the spread of COVID-19.

61.     These orders were issued because of, among other things, the spread of COVID-19 and, in particular, the rampant transmission of the virus through human contact with affected property.

62.     The orders also were issued because of, among other things, direct physical loss of or damage to property caused by or resulting from a Cause of Loss covered under the Policy.

63.     The orders have operated to prohibit access to Legal Sea Foods' insured location, among other places.

64.     The prohibition of access is a result of damage to property and the dangerous physical conditions resulting from that damage.

65.     For example, on March 13, 2020, the Governor of the Commonwealth of Massachusetts issued an order prohibiting on-premises consumption of food or drink at restaurants.[19]

66.     As a further example, effective March 16, 2020 at 10:00 p.m., the Mayor of the District of Columbia ordered the suspension of restaurant table service.[20]

67.     Likewise, on the same day, New Jersey and Rhode Island limited restaurant operations to delivery and take out.[21]

68.     Similarly, on March 19, 2020, the Governor of the Commonwealth of Pennsylvania issued an Order requiring all non-life-sustaining businesses to cease operations and close all physical locations. Businesses that were permitted to remain open were required to follow "social distancing practices and other mitigation measures defined by the Centers for Disease Control."[22]

69.     In addition, effective March 24, 2020, the Governor of the Commonwealth of Virginia ordered the closure of all dining and congregation areas in restaurants.[23]

---

[19] See Mass. Order Prohibiting Gatherings of More than 250 People (Mar. 13, 2020)
[20] See D.C. Mayor's Order 2020-048 (Mar. 16, 2020).
[21] See N.J. Exec. Order 104 (Mar. 16, 2020); R.I. Exec. Order 20-04 (Mar. 16, 2020).
[22] See Pa. Order Regarding the Closure of All Businesses that are Not Life Sustaining (Mar. 19, 2020).
[23] See Va. Exec. Order 53 (Mar. 23, 2020).

70.     Orders from various other civil authorities also have been issued and, since Legal Sea Foods' original claim, orders continue to be issued and extended, prohibiting access to Legal Sea Foods' insured locations.[24]

71.     Even where restaurants are permitted to continue delivery and take-out operations, the pandemic has had a significant impact on business volume and practices.

---

[24] See, e.g.:

MASSACHUSETTS – MA COVID-19 Order No. 13 (Mar. 23, 2020) (extending limitation on restaurants offering only delivery and takeout services until April 7, 2020); MA COVID-19 Order No. 21 (Mar. 31, 2020) (extending Order No. 13 until May 4, 2020); MA COVID-19 Order No. 30 (Apr. 28, 2020) (extending Order No. 13 until May 18, 2020); MA COVID-19 Order No. 32 (temporarily extending Order. No. 13); MA COVID-19 Order No. 35 (June 1, 2020) (clarifying procedures for opening in advance of Phase II, which permits restaurants to resume outdoor dining service only in limited capacity and submit to restrictions starting, but fails to establish date for Phase II to begin).

NEW JERSEY – N.J. Exec. Order 107 (Mar. 21, 2020 ) (superseding N.J. Exec. Order 104 by limiting restaurant operations to delivery and takeout until further notice); N.J. Exec. Order 150 (June 3, 2020) (establishing re-opening plan permitting restaurants to allow limited outdoor dining only starting June 15, 2020).

DISTRICT OF COLUMBIA – D.C. Mayor's Order 2020-063 (Apr. 15, 2020) (extending suspension of restaurant table service through May 15, 2020); D.C. Mayor's Order 2020-066 (May 13, 2020) (extending suspension of restaurant table service through June 8, 2020).

PENNSYLVANIA –  Pa. Order for Limited Reopening of Businesses, Lifting of Stay-At-Home Requirements, and Continued Aggressive Mitigation Efforts (May 8, 2020) (extending the prohibition of all dine-in facilities, including restaurants and bars, and allowing only carry-out, delivery or drive through services so long as social distancing and other mitigation measures are followed).

VIRGINIA – VA Exec, Order 61 (May 8, 2020) (extending closure of indoor dining and permitting delivery, takeout and limited outdoor dining under certain restrictions to begin May 15, 2020); VA Exec. Order 65 (June 2, 2020) (establishing Phase II re-opening and permitting limited indoor and outdoor dining to resume with restrictions starting June 5, 2020, except in Northern Virginia).

RHODE ISLAND – R.I. Exec. Order 20-15 (Mar. 30, 2020) (extending R.I. Exec. Order. 20-04 until April 13, 2020), R.I. Exec. Order 20-23 (Apr. 8, 2020) (extending R.I. Exec. Order 20-04 until May 8, 2020); R.I. Exec. Order 20-32 (May 8, 2020) (continued prohibition of on-premises consumption of food and drink at restaurant establishments with certain limited, inapplicable exceptions until May 23, 2020); R.I. Exec. Order 20-40 (May 29, 2020) (establishing Phase II re-opening plan applicable to restaurants allowing certain limited indoor and outdoor dining on June 1, 2020).

72.     For example, restaurants have had to increase frequency of cleaning, reduce operational hours, institute "no contact" food hand-off procedures, provide personal protective equipment to employees, and prohibit customers from entering their facilities.

**Legal Sea Foods' Closure and Business Interruption**

73.     COVID-19 and the resulting governmental orders have caused and continue to cause Legal Sea Foods physical loss of or damage to property and business income losses.

74.     These losses present an existential threat to a family business decades in the making and the loss of employment for Legal Sea Foods' employees, including the 3,100 employees in Massachusetts, and the fishermen on whom Legal Sea Foods relies for the freshest inventory.

**Legal Sea Foods' Claim, Strathmore's "Investigation," and its Denial**

75.     Faced with a loss that Legal Sea Foods sought to insure in purchasing the insurance in question, Legal Sea Foods made a claim under the Policy.

76.     Strathmore received Legal Sea Foods' claim on March 23, 2020, and assigned William Walker as the claims examiner.

77.     Strathmore had an obligation to conduct a prompt and reasonable investigation.

78.     Strathmore's claims "investigation" consisted of the single phone call Mr. Walker made to Richard Heller, Legal Sea Foods' Senior Vice President and General Counsel.

79.     The phone call, which was the entirety of Strathmore's investigation of a claim for losses at Legal Sea Foods' 34 locations, lasted for a total of two minutes.

80.     Strathmore did not request a calculation of Legal Sea Foods' COVID-19 related losses.

81.     Strathmore did not request copies of any of the Stay At Home Orders affecting Legal Sea Foods' business or any of its locations.

82.     Strathmore did not visit, or ask to visit, any of the Legal Sea Foods' locations.

83.     Strathmore did not investigate any of the property damage that Legal Sea Foods reported.

84.     Strathmore did not test any of Legal Sea Foods' property for the presence of COVID-19.

85.     Strathmore did not request that Legal Sea Foods test any of its property for the presence of COVID-19.

86.     Strathmore did not provide Legal Sea Foods with any other direction regarding testing its property for the presence of COVID-19.

87.     Three days after Legal Sea Foods provided its notice of loss, Strathmore completed its "investigation" and denied the claim. See Letter from W. Walker to R. Heller (Mar. 26, 2020), attached as Exhibit B.

88.     Strathmore's investigation fell well short of its legal and contractual obligations.

89.     Strathmore's letter shows that it did not understand (or tried to ignore) the nature of Legal Sea Foods' claim, which Mr. Walker characterized as "business income loss [] caused by the spoilage/contamination of your food inventory stemming from the COVID-19 pandemic." Id. at p. 1.

90.     Moreover, Strathmore's haste in denying Legal Sea Foods' claim is further evidenced by Mr. Walker's failure to even fill in portions of its form denial letter at all, including the following:

> No coverage can be afforded for your claimed [[[inventory losses]]] nor for your loss of business income due to the COVID-19 virus. Based upon this information, we are unable to indemnify you for this loss.

Id., at p. 6 (emphasis added).

91.     Not only was Strathmore's investigation careless and superficial, its conclusion was wrong.

92.     In a letter dated April 13, 2020, Richard Heller, Legal Sea Foods' Senior Vice President and General Counsel, outlined his concerns with Strathmore's coverage investigation and conclusions. See Letter from R. Heller to W. Walker (Apr. 13, 2020), attached as Exhibit C.

93.     Mr. Heller asked that Strathmore reopen its file, reconsider coverage, and reply to his letter by April 24, 2020. See id. at p. 5.

94.     On April 23, 2020, Strathmore responded to Mr. Heller's April 13, 2020 letter, advising that it was standing by its denial.  See Letter from W. Walker to R. Heller (Apr. 23, 2020), attached as Exhibit D.

95.     This last letter (id.) underscores the shortcomings in its investigation of Legal Sea Foods' claim by making no mention whatsoever of any of Legal Sea Foods' locations outside of Massachusetts or the facts affecting the suspension of operations at any of those locations.

96.     In fact, the only civil authority orders even mentioned by Strathmore in the April 23, 2020 letter are select orders issued by the City of Boston and Massachusetts Governor Charlie Baker.

97.     However, Strathmore was also notified of substantial business income losses resulting from the loss of or damage to property at and around Legal Sea Foods' locations in Washington, D.C., Virginia, New Jersey, Rhode Island, and Pennsylvania.

98.     In denying Legal Sea Foods' claim, Strathmore summarily concluded that Legal Sea Foods' losses "do[] not constitute physical loss of or damage to either covered property at the described premises or damage to any property in the surrounding area which would limit access to the insured location(s)." Exhibit B at p. 2.

99.     Yet, by the Policy's plain terms, Legal Sea Foods' inability to use its insured premises to operate its business due to COVID-19 is sufficient to trigger business income and related coverages.

100.     Strathmore also improperly relies on certain Policy exclusions that do not apply to Legal Sea Foods' claim.

101.     For example, in its April 23, 2020 letter, Strathmore relies on the "ordinance or law" exclusion as a justification for its earlier denial.  Exhibit D at p. 3.

102.     Strathmore had not raised this exclusion in its prior denial letter to Legal Sea Foods, despite its demonstrated knowledge that Legal Sea Foods' operations were affected by the Stay At Home Orders. See Exhibit C at p. 1 ("local authorities ordered certain categories of businesses, including restaurants, to close to the public in order to prevent the speared of a contagious virus from person to person.").

103.     Regardless, assuming Strathmore did not waive the "ordinance or law" exclusion by failing to raise it initially, the "ordinance or law" exclusion does not apply to Legal Sea Foods' claim, since it is predicated on the physical loss of or damage to property and resulting civil authority orders, not an ordinance or law.

104.     Even if the "ordinance or law" exclusion could apply to Legal Sea Foods' claim, which it cannot, the exclusion would be in irreconcilable conflict with the specific grant of Civil Authority coverage and, thus ambiguous and subject to construction in favor of Legal Sea Foods. See, e.g., Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012) ("The insurer bears the burden of demonstrating that an exclusion exists that precludes coverage, and any ambiguities in the exclusion provision are strictly construed against the insurer.").

105.    Similarly, Strathmore cites the Policy's exclusion for "[a]cts or decisions, including the failure to act or decide, or any person, group, organization or governmental body." Exhibit B at p. 2.

106.    The "acts or decisions" exclusion does not apply to Legal Sea Foods' claim.

107.    Moreover, courts have found that this exclusion is ambiguous, and the ambiguity should be resolved against the insurer. See, e.g., Jussim v. Massachusetts Bay Ins. Co., 33 Mass. App. Ct. 235, 238-39, 597 N.E.2d 1379, 1382 (1992), aff'd as amended, 415 Mass. 24, 610 N.E.2d 954 (1993) ("The clause…cannot be taken literally. If it were to be so taken, it would exclude coverage from all acts and decisions of any character of all persons, groups, or entities. Such an interpretation would leave the insurance policy practically worthless.").

108.    In denying Legal Sea Foods' claim, Strathmore failed to faithfully apply its own Policy language, failed to conduct a meaningful investigation, and failed to consider the facts relevant to Legal Sea Foods' claim against the Policy language.

109.    Accordingly, on May 5, 2020, Legal Sea Foods' counsel sent a letter to Strathmore, responding to Strathmore's updated coverage position and demanding payment under the Policy. See Letter from M. Levine to W. Walker (May 5, 2020), attached as Exhibit E.

110.    As of the date of this filing, Strathmore has refused to acknowledge its duty to indemnify Legal Sea Foods under the Policy for the losses resulting from COVID-19.

111.    Upon information and belief, Strathmore has failed to adopt and implement reasonable investigation standards for COVID-19 claims and, instead, has instituted a practice of systematically denying its insureds' COVID-19 claims.

112.    As a result of Strathmore's wrongful denial and inadequate investigation, Legal Sea Foods has suffered and continues to suffer damages.

## COUNT I: BREACH OF CONTRACT
### (Physical Loss of or Damage, Business Interruption, and Extra Expense Coverage)

113.    Legal Sea Foods repeats and realleges the allegations in the preceding paragraphs.

114.    The Policy is a valid and enforceable contract between Legal Sea Foods and Strathmore.

115.    In the Policy, Strathmore promised to pay for losses of business income incurred as a result of causes of loss not excluded.

116.    Specifically, Strathmore promised to pay for losses of business income and extra expense sustained as a result of a suspension of business operations.

117.    COVID-19 has caused and continues to cause direct physical loss of or damage to Legal Sea Foods' property and the property of those upon whom Legal Sea Foods relies.

118.    Because of the direct physical loss of or damage to property, Legal Sea Foods has experienced a slowdown or cessation of its business (i.e., a "suspension," as defined by the Policy).

119.    These suspensions and losses triggered the Policy's business income and extra expense coverages.

120.    Legal Sea Foods has complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

121.    Nonetheless, Strathmore unjustifiably refused to pay for these losses and expenses in breach the Policy.

122.    Legal Sea Foods has suffered and continues to suffer damages as a result of Strathmore's breach of the Policy.

123.    Legal Sea Foods is entitled to damages as a result of Strathmore's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems proper.

## COUNT II: BREACH OF CONTRACT
### (Civil Authority Coverage)

124.     Legal Sea Foods repeats and realleges the allegations in the preceding paragraphs.

125.     The Policy is a valid and enforceable contract between Legal Sea Foods and Strathmore.

126.     In the Policy, Strathmore promised to pay for losses of business income and extra expense incurred as a result of certain actions taken by civil authorities that prohibit access to Legal Sea Foods' premises.

127.     COVID-19 related direct physical loss of or damage to properties within a one mile radius of Legal Sea Foods' property caused civil authorities to prohibit access to Legal Sea Foods' premises.

128.     Legal Sea Foods has experienced and continues to experience a loss under the Policy's civil authority coverage arising from the direct physical loss of or damage to property caused by COVID-19 and the resulting state and local orders.

129.     These actions, losses, and expenses triggered civil authority coverage under the Policy.

130.     Legal Sea Foods has complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

131.     Nonetheless, Strathmore unjustifiably refused to pay for these losses and expenses in breach of the Policy.

132.     Legal Sea Foods has suffered and continues to suffer damages as a result of Strathmore's breach of the Policy.

133.     Legal Sea Foods is entitled to damages as a result of Strathmore's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems proper.

## COUNT III: VIOLATION OF M.G.L. c. 93A

134.     Legal Sea Foods repeats and realleges the allegations in the preceding paragraphs.

135.     Massachusetts General Laws c. 93A, § 2 prohibits the use or employment of unfair or deceptive acts or practices in the conduct of trade or commerce.

136.     Strathmore is engaged in the business of insurance in the Commonwealth of Massachusetts.

137.     Strathmore had a duty to act in good faith when handling Legal Sea Foods' claim.

138.     Strathmore had a statutory duty to engage in fair settlement practices under M.G.L. c. 93A.

139.     Strathmore's systematic and summary denial of Legal Sea Foods' claim violated its duty of good faith and its statutory duty to engage in fair settlement practices.

140.     In particular, Strathmore violated its statutory obligations by engaging in, *inter alia*, the following acts or practices related to Legal Sea Foods' claim:

a.     Misrepresenting pertinent facts or insurance Policy provisions relating to coverages at issue;

b.     Failing to act reasonably upon communications with respect to Legal Sea Foods' claims;

c.     Failing to adopt and implement reasonable standards for the prompt investigation of claims;

    d.      Refusing to pay claims without conducting a reasonable investigation based upon all available information;

    e.      Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

    f.      Compelling Legal Sea Foods to institute this litigation to recover amounts due under the Policy; and

    g.      Failing to provide a reasonable explanation of the basis in the insurance Policy in relation to the facts or applicable law for the denial of Legal Sea Foods' claim.

141.    Strathmore's acts and conduct occurred in such a manner as to appear to constitute its general business practice in the handling of such claims.

142.    For example, Strathmore used a form letter to deny Legal Sea Foods' claim and, in doing so, did not even populate all of the fields in its form denial letter.

143.    Strathmore's acts and conduct constitute unfair or deceptive acts and practices in violation of Massachusetts's statute.

144.    As a direct, foreseeable and proximate result of Strathmore's unfair and deceptive acts and practices, Legal Sea Foods has sustained actual damages, including but not limited to the following:

    a.      The amount of its claim, which is continuing;

    b.      Expenses incurred after Strathmore's breach of the Policy while pursuing the claim, including attorney's fees; and

    c.      Interest on the aforesaid damages.

145. Strathmore's violations of M.G.L. c. 93A have caused and will continue to cause harm to Legal Sea Foods, entitling Legal Sea Foods to an award of actual damages, plus attorneys' fees.

146. Strathmore's violations of M.G.L. c. 93A were knowing and willful, entitling Legal Sea Foods to an award of multiple damages.

## COUNT IV: DECLARATORY JUDGMENT

147. Legal Sea Foods repeats and realleges the allegations in the preceding paragraphs.

148. Legal Sea Foods seeks the Court's declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.

149. A justiciable controversy exists between Legal Sea Foods and Strathmore about whether the Policy provides coverage for Legal Sea Foods' claim.

150. Accordingly, Legal Sea Foods seeks a declaration from the Court that:

a. The Policy covers Legal Sea Foods' claim; and

b. No Policy exclusion applies to bar or limit coverage for Legal Sea Foods' claim.

## REQUEST FOR RELIEF

Legal Sea Foods respectfully requests that the Court enter judgment in its favor and against Defendant, as follows:

a. As to Count I, that Strathmore breached the Policy by failing to pay Legal Sea Foods' business interruption losses and extra expense claim;

b. As to Count II, that Strathmore breached the Policy by failing to pay Legal Sea Foods' business interruption losses and extra expense claim under the Policy's civil authority coverage;

c.      As to Count III, that Strathmore violated its statutory obligations; and

d.      As to Count IV, a declaration that (1) the Policy covers Legal Sea Foods' claim; and (2) that no exclusion in the Policy applies to bar or limit coverage for Legal Sea Foods' claim.

## **JURY TRIAL DEMANDED**

Legal Sea Foods demands trial by jury.

***

Date:  June 5, 2020

Respectfully submitted,

PLAINTIFF LEGAL SEA FOODS, LLC

By and through its attorneys,

*/s/ Michael S. Levine*
Michael S. Levine (BBO # 633248)
  *mlevine@hunton.com*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
Phone:  (202) 955-1857
Fax:  (202) 778-2201

Harry L. Manion, III (BBO # 317440)
  *hmanion@hunton.com*
Christopher M. Pardo (BBO # 674674)
  *cpardo@hunton.com*
Anna L. Rothschild (BBO # 703881)
  *arothschild@hunton.com*
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02116
Phone:  (617) 648-2700
Fax:  (617) 433-5022

 -and-

Rachel E. Hudgins (*pro hac vice* pending)
  *rhudgins@hunton.com*
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree St. NE
Atlanta, GA 30308
Phone:  (404) 888-4000
Fax:  (404) 888-4190

## <u>CERTIFICATE OF SERVICE</u>

I, Michael S. Levine, hereby certify that I served the foregoing on all counsel of record, through the Court's CM/ECF e-filing system on June 5, 2020.

*/s/ Michael S. Levine*
Michael S. Levine
